**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------X
                                           :    OPINION & ORDER
                                           :    02 MDL 1484(JFK)
In re MERRILL LYNCH & CO., INC.            :
RESEARCH REPORTS SECURITIES LITIGATION     :
                                           :         ___
-------------------------------------------X
This Document Relates To:
-------------------------------------------X
                                           :
Shadi S. Dabit v. Merrill Lynch, Pierce,   :
Fenner & Smith, Inc.                       :    02 Civ. 8472(JFK)
-------------------------------------------X
```

**APPEARANCES**

<u>For Plaintiff:</u>
    FEDERMAN & SHERWOOD
        10205 N. Pennsylvania Avenue
        Oklahoma City, OK 73120
            Of Counsel:    William B. Federman, Esq.

    DUNN, SWANN & CUNNINGHAM
        2800 Oklahoma Tower
        210 Park Avenue
        Oklahoma City, OK 73102
            Of Counsel:    Clell I. Cunningham, III, Esq.

<u>For Defendant:</u>
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        Four Times Square
        New York, NY 10035
            Of Counsel:    Jay B. Kasner, Esq.
                          Scott D. Musoff, Esq.
                          Joanne Gaboriault, Esq.

**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

Before the Court is the motion of Terry Ray Morris ("Morris") to intervene as the lead plaintiff in this putative class action, made pursuant to Rule 24 of the Federal Rules of Civil Procedure. The present application follows the Court's Memorandum Opinion and Order of September 18, 2007, in which I denied the motion of the original class plaintiff, Shadi S. Dabit ("Dabit"), to join, or alternatively to substitute, the trustee of his estate in bankruptcy as lead plaintiff, on the ground that neither Dabit nor the trustee of his bankruptcy estate had standing. See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (In re Merrill Lynch & Co. Research Reports Sec. Litig.), 375 B.R. 719 (S.D.N.Y. 2007). Although Dabit's complaint was dismissed, the Court retained jurisdiction of this action and permitted potential class members to file motions to intervene. This timely motion, which is the sole motion to be filed by a potential intervenor, ensued. For the reasons that follow, the motion is denied.

**BACKGROUND**

Like Dabit, Morris is a securities broker who was formerly employed by Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch," or "Defendant"). Morris' proposed Complaint in Intervention (the "Intervention Complaint") invokes the Court's diversity jurisdiction and asserts state law claims against Merrill Lynch for breach of fiduciary duty and breach of an

implied covenant of good faith and fair dealing. The causes of action are asserted on behalf of Morris and numerous other Merrill Lynch securities brokers who, from December 1, 1999, through December 31, 2000, recommended that their clients purchase the stocks of various Internet-based companies that were the subjects of favorable research reports issued by Merrill Lynch. The Intervention Complaint alleges that the research analysts who wrote the reports bestowed falsely positive ratings on the subject stocks in order to inflate artificially the share prices of the stocks and thus obtain lucrative investment banking business for Merrill Lynch. Morris claims that, when Merrill Lynch's fraudulent conduct was revealed and the prices of the recommended stocks fell, the plaintiff-brokers were abandoned by their clients, resulting in plaintiffs' loss of future commissions. The complaint alleges that Defendant's fraudulent conduct constituted a breach of the fiduciary duty that Defendant owed to its employees, as well as a breach of the covenant of good faith and fair dealing that was implied in the plaintiff-brokers' employment contract with Merrill Lynch.

*Procedural History*

This action is one of many that followed in the wake of the announcement by the New York State Attorney General's Office (the "NYAG") of allegations against Merrill Lynch stemming from the company's issuance of allegedly fraudulent research reports. In

April 2002, the NYAG filed an affidavit detailing its investigation into conflicts of interest between Merrill Lynch's Internet Group and its investment banking division (the "NYAG Affidavit"). Specifically, the NYAG Affidavit alleged that, in research reports published by Merrill Lynch, the company's analysts regularly gave highly positive ratings to certain Internet-based securities when, in fact, the analysts did not believe the securities deserved the ratings. The NYAG Affidavit asserted that the analysts were not objective in their assessments of the companies' stocks but rather published the falsely rosy reports in order to generate underwriting business for Merrill Lynch and to obtain large bonuses for themselves. The affidavit was offered in support of an application before the New York state courts for an order requiring Merrill Lynch employees to turn over documents and give testimony in the Attorney General's continuing investigation into whether Merrill Lynch violated New York state law. The NYAG's highly publicized investigation into Merrill Lynch's alleged conflicts of interest led to the filing of over one hundred class action complaints against the company in courts throughout the country.

Dabit filed the original class complaint in this action on April 26, 2002, in the United States District Court for the Western District of Oklahoma, asserting state law claims, in diversity, for breach of fiduciary duty and breach of an implied covenant of good faith and fair dealing. The original class

complaint alleged that Dabit and members of the class suffered losses, in addition to lost future commissions, because they and their brokerage clients were induced by the fraudulently optimistic research reports issued by Merrill Lynch to purchase and/or retain securities whose prices were artificially inflated. The Western District of Oklahoma dismissed the original class complaint without prejudice on the ground that Dabit's claims were preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), because the complaint alleged fraud in connection with the purchase or sale of nationally traded securities.

In an attempt to avoid SLUSA's preemptive scope, Dabit subsequently filed an amended complaint in which he alleged that the plaintiff-brokers and their clients "owned" or "held," rather than "purchased," the securities that were recommended by Merrill Lynch. Thus, Dabit's amended complaint alleged two categories of harm: first, that Defendant's conduct caused the class to suffer losses as a result of retaining artificially inflated securities (the "holding claims"); and second, that the fraudulent conduct caused the plaintiff-brokers to lose clients after the prices of the stocks dropped and Merrill Lynch's fraud was revealed (the "lost commissions claims").

On October 23, 2002, the Judicial Panel on Multidistrict Litigation transferred Dabit's action, along with all of the other actions filed nationwide relating to Merrill Lynch's allegedly

fraudulent research reports, to the Southern District of New York for pre-trial consolidation, before the late Honorable Milton Pollack. On April 10, 2003, Judge Pollack dismissed Dabit's amended complaint in its entirety, with prejudice, on the grounds that all of Dabit's claims were preempted by SLUSA. See In re Merrill Lynch & Co. Reseacrh Reports Sec. Litig., No. 02 MDL 1484 (MP), 2003 U.S. Dist. LEXIS 5999, at *1-2 (S.D.N.Y. Apr. 10, 2003) ("Dabit I").

In January, 2005, the Second Circuit affirmed in part and vacated in part Judge Pollack's decision. See Dabit v. Merrill Lynch, Pierce, Fenner & Smith, 395 F.3d 25 (2d Cir. 2005) ("Dabit II"). The Court of Appeals concluded that, to the extent Dabit was able to plead that he and other members of the class had been fraudulently induced only to retain rather than purchase or sell securities, the holding claims were not preempted by SLUSA. Accordingly, the Second Circuit vacated the with-prejudice dismissal of the holding claims and remanded to this Court for those claims to be dismissed without prejudice to allow Dabit leave to replead. The circuit also vacated Judge Pollack's with-prejudice dismissal of the lost commissions claims, finding that those claims were not preempted by SLUSA.

In September, 2005, the Supreme Court granted Defendant's petition for a writ of certiorari for the sole purpose of reviewing the Second Circuit's disposition of the holding claims. In March,

2006, the Supreme Court vacated the judgment of the Second Circuit relating to Dabit's holding claims. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71 (2006) ("Dabit III"). The Supreme Court held that, for the purpose of determining whether claims are preempted under SLUSA, the distinction between holders and purchasers of securities was irrelevant and that Dabit's allegations that Merrill Lynch's fraud induced the plaintiffs to retain securities were sufficient to trigger preemption under SLUSA. Thus, the Supreme Court reinstated Judge Pollack's dismissal-with-prejudice of Dabit's holding claims. The Supreme Court expressly stated, however, that it was not reviewing the Second Circuit's vacatur of Judge Pollack's dismissal of Dabit's lost commissions claims.

After the case was remanded to this Court following Dabit III, Dabit indicated that he wished to continue to prosecute his lost commissions claims. During the pendency of the extended appellate proceedings in this case, however, Dabit had filed for bankruptcy, thus raising a concern about his ability to continue as the lead plaintiff. In August, 2007, Dabit moved to join or, alternatively, to substitute as lead plaintiff, the trustee of his bankruptcy estate. On September 18, 2007, the Court denied Dabit's motion but permitted absent class members to file motions for intervention. The present motion followed.

*The Intervention Complaint*

The Intervention Complaint asserts the same state law causes of action as were asserted in Dabit's amended complaint and contains identical allegations relating to the Defendant's fraudulent conduct. The Intervention Complaint attaches as an exhibit a list of forty-eight publicly-traded Internet-based securities that were the subject of allegedly fraudulent Merrill Lynch-issued research reports (the "ML Stocks"). Morris and the class of plaintiff-brokers recommended the ML Stocks to their clients during the class period, which is defined as running from December 1, 1999 through December 31, 2000, in reliance on research reports issued by Merrill Lynch, in which Merrill Lynch's analysts bestowed optimistic price projections and "buy" recommendations on the stocks.

The Intervention Complaint alleges that "[d]uring 1999 and 2000, [Merrill Lynch] made materially false and misleading statements designed to encourage Plaintiff's clients to continue to hold the ML Stocks." (Intervention Compl. ¶ 31.) The Intervention Complaint asserts that the research reports were false because "throughout late 1999 and early 2000, [Merrill Lynch] knew that the financial condition and future business prospects of the corporations behind these stocks did not support [Merrill Lynch's] positive comments and buy recommendations, but [Merrill Lynch] nevertheless continued to issue positive research reports encouraging investors to hold the [Merrill Lynch-recommended]

stocks." (Id. ¶ 32.)  Although the Intervention Complaint does not
identify which particular research reports, or which statements
within the reports, were false, the complaint attaches as an
exhibit the NYAG Affidavit and incorporates by reference all of the
factual allegations contained in that document.

The issuance of the falsely optimistic research reports
was allegedly designed to drive up the share prices of the ML
Stocks and thus induce the subject companies to give Merrill Lynch
valuable underwriting business.  Merrill Lynch's analysts were
encouraged to give the stocks positive ratings and optimistic price
projections by the promise of large bonuses that were keyed to the
amount of investment banking business that the positive reports
generated.  Plaintiffs, in alleged reliance on the advertised
objectivity of the Defendant's reports and blithely unaware of the
alleged conflicts of interest that motivated the issuance of the
falsely rosy research, advised their retail clients to hold on to
the ML Stocks.  The Intervention Complaint alleges that, when the
prices of the ML Stocks tumbled in the first quarter of 2000 and
the conflict of interest between Merrill Lynch's research and
investment banking operations became publically exposed,
Plaintiffs' clients took their business elsewhere, causing
Plaintiffs to suffer financial losses in the form of lost
commissions.

**DISCUSSION**

9

Morris has moved to intervene as plaintiff and proposed class representative in this action as a matter of right, pursuant to Rule 24(a)(2) or, alternatively, permissively, pursuant to Rule 24(b). Defendant challenges the proposed intervention solely on the ground of legal futility, asserting that the filing of the Intervention Complaint would be futile for the following reasons: (i) the Intervention Complaint remains preempted by SLUSA; (ii) the Intervention Complaint, which sounds in fraud, fails to allege fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; (iii) the Intervention Complaint fails to state a claim, under either Oklahoma or New York state law, for either breach of fiduciary duty or breach of the implied covenant of good faith and fair dealing; and (iv) the damages claimed in the Intervention Complaint are too speculative to afford relief.

Rule 24(a)(2) provides in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2). Intervention is granted as a matter of right where the proposed intervenor: "(1) file[s] a timely motion; (2) show[s] an interest in the litigation; (3) show[s] that its interest may be impaired by the disposition of the action; and (4) show[s] that its interest is not adequately protected by the

parties to the action." <u>D'Amato v. Deutsche Bank</u>, 236 F.3d 78, 84 (2d Cir. 2001) (internal quotation marks and citations omitted). Similarly, Rule 24(b) provides for permissive intervention "[u]pon timely application . . . when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). "Substantially the same factors [as intervention of right] are considered in determining whether to grant an application for permissive intervention pursuant to Fed. R. Civ. P. 24(b)(2)." <u>In re Bank of New York Derivative Litig.</u>, 320 F.3d 291, 300 n.5 (2d Cir. 2003).

Merrill Lynch does not claim that any of the factors expressly set forth in Rule 24 supply a basis for denial of the present motion. Rather, Merrill Lynch argues that the proposed intervention should be denied on futility grounds. Although legal futility is not mentioned in Rule 24, courts have held that futility is a proper basis for denying a motion to intervene. <u>See, e.g.</u>, <u>U.S. v. Glens Falls Newspapers, Inc.</u>, 160 F.3d 853, 856 (2d Cir. 1998) (upholding district court's denial of motion to intervene on futility grounds); <u>Williams & Humbert, Ltd. v. W. & H. Trade Marks, Ltd.</u>, 840 F.2d 72, 74 (D. C. Cir. 1988) (finding that Rule 24(a)(2)'s requirement that intervenor have legally cognizable interest depends in part on whether intervenor has stated legally sufficient claim); <u>Kirby v. Coastal Sales Assocs.</u>, 199 F.R.D. 111, 118 (S.D.N.Y. 2001); <u>Moss v. Stinnes Corp.</u>, No. 92 Civ 3788 (JFK),

1997 U.S. Dist. LEXIS 12783, at *2 (S.D.N.Y. Aug. 25, 1997), aff'd
169 F.3d 784, 785 (2d Cir. 1999). ("Mr. Moss' motion to intervene
is denied because his proposed claims in intervention fail to state
a valid claim for relief."); Ceribelli v. Elghanayan, No. 91 Civ.
3337, 1994 U.S. Dist. LEXIS 13681, 1994 WL 529853 at *2 (S.D.N.Y.
Sept. 28, 1994) (noting that legal futility is a basis for
rejecting a proposed intervention under Fed. R. Civ. P. 24); see
also Charles Alan Wright, Arthur R. Miller, and Mary Kay Wright, 7C
Federal Practice & Procedure, § 1914 (3d ed.) at p. 523-24 (stating
that "[t]he proposed pleading [in intervention] must state a good
claim for relief or a good defense").

In determining whether the proposed intervention is
futile, the court must view the application "on the tendered
pleadings -- that is, whether those pleadings allege a legally
sufficient claim or defense and not whether the applicant is likely
to prevail on the merits." Williams & Humbert, Ltd., 840 F.2d at
75. Thus, in considering the sufficiency of the proposed
Intervention Complaint, the Court employs the same standards as it
would apply in considering a motion to dismiss for failure to state
a valid claim. Specifically, the court must accept all allegations
in the proposed complaint as true. Bernheim v. Litt, 79 F.3d 318,
321 (2d Cir. 1996). The court, however, is not required to accept
as true conclusory allegations or "a legal conclusion couched as a
factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

In determining the sufficiency of the proposed claims, the court should "read the complaint generously and draw reasonable inferences in favor of the pleader." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). The court's function "is merely to assess the legal feasibility of the [proposed intervention] complaint, not to assay the weight of the evidence which might be offered in support thereof." Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980). With these standards in mind, the Court turns to Merrill Lynch's alternate arguments for denial of the present motion on futility grounds.

*I. SLUSA Preemption*

Defendant argues that the Intervention Complaint is preempted by SLUSA "because it is a putative class action brought under state law theories alleging misrepresentations, omissions and manipulative or deceptive devices and contrivances in connection with the purchase and sale of nationally traded securities." (Def. Mem. at 7-8.) Morris counters that the Second Circuit, in Dabit II, expressly held that claims for lost commissions are not preempted by SLUSA, that the Supreme Court's decision in Dabit III left untouched the Second Circuit's holding relating to the lost commissions claims, and that accordingly, under the law of this case, the claims for lost commissions are not preempted by SLUSA.

SLUSA imposes the following limitations on putative state-law class actions:

> (1) Class Action Limitations. No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging --
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1). Thus, for an action to be preempted under SLUSA, the following four-part test must be met:

> (1) the . . . suit must be a "covered class action"; (2) the action must be based on state or local law; (3) the action must concern a "covered security"; and (4) the defendant must have misrepresented or omitted a material fact or employed a manipulative device or contrivance "in connection with the purchase or sale" of that security.

Felton v. Morgan Stanley Dean Witter & Co., 429 F. Supp. 2d 684, 690-91 (S.D.N.Y. 2006). Here, it is undisputed that the Intervention Complaint meets the first three factors: this action is (1) a "covered class action," that is (2) based on state law causes of action, and (3) concerns "covered securities." At issue is whether Morris, in asserting a claim for lost commissions, has alleged fraud "in connection with the purchase or sale" of securities.

Merrill Lynch argues that the Supreme Court's holding in Dabit III, in which the Court construed SLUSA broadly to include

Dabit's claims that the Defendant's fraud related to the retention of securities (that is, the holding claims), also encompasses Morris' claims for lost commissions. Merrill Lynch asserts that Morris' claims stem from allegations of "misstatements, omissions, deception and manipulation that coincide with the purchase and sale of securities," namely, the defendant's manipulative scheme to bestow unearned favorable ratings on the ML Stocks, artificially inflate the stock prices, and thereby gain investment banking business from the issuers. (Def. Mem. at 11.) Defendant points to the Supreme Court's conclusion, in Dabit III, that the "fraudulent manipulation of stock prices . . . unquestionably qualifies as 'fraud in connection with the purchase or sale' of securities as the phrase is defined" in prior Supreme Court cases. Dabit III, 547 U.S. at 89 (citations omitted). Thus, Merrill Lynch argues, the Intervention Complaint must be dismissed because "Morris' allegations concerning '[Merrill Lynch's] wrongful actions,' like Dabit's, all 'coincide' with the purchase or sale of covered securities." (Def. Mem. at 11.)

It is true that Dabit III broadened the scope of what is meant, in SLUSA, by fraudulent conduct "in connection with the purchase or sale of a covered security." The Dabit III Court left no doubt that SLUSA's preemptive orbit includes claims based on the retention, rather than simply the purchase or sale, of covered securities. However, regardless of the breadth of Dabit III's

construal of SLUSA's preemptive scope, the Supreme Court accepted certiorari only to review the portion of the Second Circuit's decision in <u>Dabit II</u> that dealt with Dabit's holding claims. The Court expressly declined to consider <u>Dabit II</u>'s disposition of the lost commissions claims, stating as follows: "The Court of Appeals also concluded that Dabit's lost commission claims escaped preemption under SLUSA because they did not 'allege fraud that coincide[s] with the sale or purchase of a security.' <u>That determination is not before this Court for review</u>." <u>Dabit III</u>, 547 U.S. at 77 n.3 (quoting <u>Dabit II</u>, 395 F.3d at 47) (emphasis added). Thus, the Supreme Court's decision in <u>Dabit III</u> did not alter the circuit's holding in <u>Dabit II</u> regarding the lost commissions claims. In <u>Dabit II</u>, the Second Circuit concluded that claims for lost commissions were not preempted by SLUSA for the following reasons:

> Dabit's claim regarding commissions lost when customers abandoned Merrill Lynch following disclosure of its improper practices fares better [than the holding claims]. This claim, brought on behalf of a putative class of brokers who "recommended [the defined ML stocks] to their clients" during the relevant class period and who "suffered damages as a consequence of the loss of clients due to ML's wrongful actions," relies not on the purchase or sale of any security in connection with the fraud, but on the absence of any such transactions by clients of the class members after the fraud was disclosed. Although we have not discovered another case discussing the effect of SLUSA on this apparently novel theory of recovery and express no opinion regarding its underlying merit, <u>it is clear that such a claim, by its very nature, does not allege fraud that "coincides" with the sale or purchase of a security.</u> [SEC v.] <u>Zandford</u>,

> 535 U.S. 813,[] 825 [2002]. <u>It is therefore not preempted</u>
> <u>by SLUSA.</u>

<u>Dabit II</u>, 395 F.3d at 47 (footnote omitted) (emphasis added).
Accordingly the Second Circuit concluded that "[w]e therefore
reverse so much of the district court's order as dismissed the lost
commissions claim and remand it for further proceedings." <u>Id.</u> The
Second Circuit's ruling, in <u>Dabit II</u>, that the lost commissions
claims lay outside SLUSA's preemptive orbit, remains good law. <u>See</u>
<u>Felton</u>, 429 F. Supp. 2d at 693 n.9 ("In Dabit [III], the Supreme
Court disagreed with the Second Circuit's conclusion that a 'holder
class' exemption should be found to exist within the SLUSA
framework, and accordingly vacated the judgment on that ground.
The Supreme Court did not, however, take issue with other
substantive conclusions reached by the Second Circuit in the Dabit
[II] decision, and for those conclusions the Second Circuit's Dabit
[II] decision is still good law.").

This Court declines to contravene the Court of Appeals'
holding, because it is the law of this case. The Second Circuit
may eventually revisit, in light of <u>Dabit III</u>, the question of
whether state law claims for lost commissions resulting from an
alleged fraudulent scheme to inflate the price of securities are
preempted by SLUSA. But it is not this Court's office, on remand,
to overturn the Court of Appeals' determination.

Merrill Lynch's argument that the circuit's holding in
<u>Dabit II</u> need not apply because the present lost commission claims
are newly asserted by Morris, rather than Dabit, is unavailing.  As
discussed, the claims in the Intervention Complaint regarding lost
commissions are identical to those that were asserted in Dabit's
complaint, dismissed by Judge Pollack, and subsequently reinstated
by the Court of Appeals in <u>Dabit II</u>.  The Second Circuit's holding
that Dabit's lost commissions claims were not preempted by SLUSA
applies with full force to Morris' claims.

Merrill Lynch's argument that <u>Dabit III</u> vacated the
entirety of the Second Circuit's decision in <u>Dabit II</u> is also
without merit.  As noted, the Supreme Court expressly stated that
it was not reviewing the circuit's disposition of the lost
commissions claims.  The Supreme Court's ruling, that the judgment
of the Second Circuit was vacated, thus related only to the holding
claims. The law of this case remains that the claims for lost
commissions, originally asserted by Dabit and now asserted by
Morris, are not preempted by SLUSA.

In sum, the Intervention Complaint is not preempted by
SLUSA, and the present motion to intervene may not be denied as
futile on this ground.

## II. Failure to Plead Fraud with Particularity

Merrill Lynch argues that the Intervention Complaint
sounds in fraud, is therefore required to comply with the

heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and fails to allege facts with the particularity required of Rule 9(b). Morris counters that the Intervention Complaint asserts causes of action that are not denominated as fraud; thus, Morris argues, the complaint must comply only with the simple pleading requirements of Rule 8.

Although the causes of action asserted in the Intervention Complaint are denominated as state law claims of breach of fiduciary duty and breach of an implied covenant of good faith and fair dealing, the claims indisputably are based on plaintiffs' allegations of Defendant's fraudulent conduct. "By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (citation omitted); see also Apace Communs., Ltd. v. Burke, 522 F. Supp. 2d 512, 514 (W.D.N.Y. 2007) ("Therefore, as to each of these causes of action, plaintiffs must not only plead the elements of the relevant claim under [applicable state] law, but they must also meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which provides that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'") (quoting Fed. R. Civ. P. 9(b)). "Rule 9(b)'s

heightened pleading standards apply to breach of fiduciary duty claims where the breach is premised on the defendant's fraudulent conduct . . . such as an attempt 'to induce action or inaction on the part of the investors by means of falsehoods or material omissions.'" Id. at 519 (quoting Henneberry v. Sumitomo Corp. of America, No. 04 Civ. 2128, 532 F. Supp. 2d 523, 2007 U.S. Dist. LEXIS 50633, 2007 WL 2068346, at *30 (S.D.N.Y. July 12, 2007)); see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007).

As noted, the Intervention Complaint alleges that Defendant orchestrated a scheme to inflate artificially the price of the ML Stocks in order to obtain investment banking business from the subject companies. To effectuate this scheme, the Intervention Complaint alleges that Merrill Lynch's analysts, made material false statements, in the form of falsely positive stock ratings and comments, that induced Morris and his fellow brokers to recommend that their clients retain the ML Stocks. These allegations, in essence, provide the entire basis for Morris' state law claims. The Intervention Complaint repeatedly characterizes the Defendant's conduct in terms that undisputedly sound in fraud. For example, Morris alleges that Merrill Lynch "misrepresented to Plaintiff that the [Merrill-Lynch-recommended stocks] were worthy of holding in Plaintiff's clients' portfolios" (Inter. Compl. ¶ 2); that the defendant "systematically taught and encouraged its

Brokers to tell clients to own and hold the ML stocks" and "never disclosed to its Brokers the real basis for its recommendations to hold such stocks" (id. ¶ 9); that Merrill Lynch caused its research department "to issue falsely favorable reports about ML Stocks without disclosing the manipulative scheme" (id. ¶ 10); that "[t]hroughout the Class Period, [Merrill Lynch's] ratings, reports, and recommendations regarding the ML stocks were false and contained misleading statements, designed to inflate and artificially support the price of the ML Stock" (id. ¶ 26); and that "[d]uring 1999 and 2000, [Merrill Lynch] made materially false and misleading statements designed to encourage Plaintiff's clients to continue to hold the ML Stocks." (Id. ¶ 31.) These allegations are clearly "averments of fraud," within the meaning of Rule 9(b). Because the allegations sound in fraud, they trigger the heightened pleading requirements of Rule 9(b), regardless of how Morris has denominated his causes of action. See Rombach, 355 F.3d at 171.

Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006); see also Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994) ("[A]ctual fraudulent statements or conduct and the fraud alleged must be stated with particularity"). "The primary purpose of Rule 9(b) is

to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." <u>Novak v. Kasaks</u>, 216 F.3d 300, 314 (2d Cir. 2000) (quoting <u>Ross v. Bolton</u>, 904 F.2d 819, 823 (2d Cir. 1990) (internal quotation marks omitted)). On the other hand, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). A plaintiff must also allege facts that give rise to a "strong inference of fraudulent intent" either by "a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994).

The Intervention Complaint is utterly lacking in the specificity required by Rule 9(b). The complaint fails to identify: a single specific false statement; a single research report that contained allegedly false statements; the author(s) of the false statements; why the (unspecified) statements were in fact false when made; or the dates on which the false statements were made, apart from identifying "1999 to 2000" as the general period during which the relevant research reports were issued. These allegations do not satisfy Rule 9(b). See <u>Luce v. Edelstein</u>, 802 F.2d 49, 54 (2d Cir. N.Y. 1986) (allegations "which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the 'particulars' required by Rule

9(b)"); <u>In re Merrill Lynch Reserach Reports Sec. Litig.</u>, 273 F.
Supp. 2d 351, 371 (S.D.N.Y. 2003), <u>aff'd in part and vacated in
part on other grounds by</u> <u>Lentell v. Merrill Lynch</u>, 396 F.3d 161 (2d
Cir. 2005) ("Nowhere in these paragraphs is it specifically alleged
precisely <u>which</u> analysts had <u>which</u> conflicts of interest involving
<u>which</u> investment banking deals leading to <u>which</u> [] research reports
being misleading, to which degree, and when.") (emphasis in
original).

The Intervention Complaint's failure to allege why any of
the purportedly fraudulent statements made by Merrill Lynch's
analysts were, in fact, false when made is especially glaring.
While the complaint alleges in conclusory terms that Merrill
Lynch's failure to disclose a conflict of interest between its
investment banking and research divisions rendered false the
company's representation that its research was unbiased, there are
simply no allegations that any of the analysts' comments, ratings,
or recommendations were actually false. "To meet the pleading
requirement of Rule 9(b), plaintiffs cannot rest on their say-so
that these statements are fraudulent; they must explain why.
Having neglected to do so, they fail to plead with the requisite
particularity." <u>Rombach</u>, 355 F.3d at 174. The Intervention
Complaint contains no direct assertion, beyond the conclusory
assertion that statements in the research reports were "materially
false" and "misleading," that Merrill Lynch's analysts did not

23

genuinely believe the positive comments and ratings they gave to the ML Stocks. Nor is there any allegation that Defendant's analysts reported any financial data or other specific facts relating to the ML Stocks that were untrue. The absence of such direct allegations plainly violates Rule 9(b) and renders the Intervention Complaint fundamentally defective. Cf. In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) (finding falsity adequately pleaded where plaintiff explicitly alleged that defendants did not believe in their predictions of thirty-five percent market growth and that such growth would be "nearly impossible" to achieve); Gabriel Capital, L.P. v. Natwest Finance, Inc., 122 F. Supp. 2d. 407, 419 (S.D.N.Y. 2000) (falsity adequately pleaded where "plaintiffs have alleged that [defendants] did not genuinely or reasonably believe that Mini-Mill was 'first class' when it made that statement.").

The Intervention Complaint's incorporation by reference of the NYAG Affidavit does nothing to satisfy Rule 9(b)'s pleading requirements. While the NYAG Affidavit describes statements made by various of the Defendant's analysts indicating that the analysts were skeptical of whether the stocks that they covered deserved "buy" or "accumulate" ratings, the affidavit mainly discusses Merrill Lynch-covered stocks that are not among the forty-eight ML Stocks referenced in the Intervention Complaint. Of the forty-eight ML Stocks that Morris purportedly recommended to his clients,

24

only five are mentioned in the NYAG Affidavit: Pets.com, Webvan, Internet Capital Group ("ICGE"), Infospace, and Aether Systems. Pets.com and Webvan are mentioned only once in the NYAG Affidavit, solely for the proposition that they were among the Merrill Lynch-covered securities that plummeted in value during the period when Merrill Lynch issued positive research reports on those stocks. There are no allegations relating to any false statements about Webvan or Pets.com. Similarly, the NYAG Affidavit does not allege that Merrill Lynch made any particular false statements with respect to its coverage of ICGE. Rather, the NYAG Affidavit merely states that, at a time when Merrill Lynch gave a rating of "2-1" to ICGE, denoting a recommendation for intermediate-term accumulation and long-term purchase, Merrill Lynch's chief Internet-sector analyst, Henry Blodgett, predicted a short-term decline in stock price and stated that there was "nothing positive to say" about the stock. (Intervention Compl., Ex. B at 13.) These allegations do not show why the favorable recommendations about ICGE were false when made. Regarding Aether Systems, the NYAG Affidavit alleges that, on March 15, 2001, a Merrill Lynch analyst privately expressed the opinion that the stocks' fundamentals were "horrible," at a time when Merrill Lynch had given Aether a rating of "3-1," denoting a recommendation of intermediate-term neutrality and long-term purchase. The NYAG Affidavit also alleges that, on September 27, 2000, Merrill Lynch analysts considered downgrading

Aether's rating, yet ultimately maintained the highest rating of "1-1" for the stock until it was downgraded in February of 2000. Again, these allegations do not allege that the analysts did not genuinely believe their ratings, nor do they show why the ratings bestowed on Aether's stock were actually false when made.[1]

The NYAG Affidavit's assertions regarding false statements made in connection with Merrill Lynch's coverage of InfoSpace stock, while more detailed than the above-mentioned allegations, are also insufficient to meet Rule 9(b)'s requirement of specificity. The NYAG Affidavit alleges that Merrill Lynch initiated coverage of Infospace in December 1999 with a "2-1" (or, "accumulate-buy") rating; shortly afterwards upgraded the stock to the highest rating of "1-1" ("buy-buy"); and maintained that rating through December 10, 2000, during which time the stock's share price fell from a high of $261 to $13.69. The NYAG Affidavit alleges that, between April and July 2000, while the price of the stock fell, Merrill Lynch's brokers expressed concern about the company's maintenance of the "1-1" rating and that Blodgett expressed "enormous skepticism" about the stock's value. (Id., Ex. B at 34.) The NYAG affidavit further alleges that, during this time period, Merrill Lynch sought to act as, and eventually became,

---

[1]In addition, the allegations relating to the rating issued on March 15, 2001 occurred after the December 31, 2000 expiration of the Intervention Complaint's Class Period and thus have no bearing on whether the complaint adequately pleads fraud.

Infospace's underwriter in the company's acquisition of the Internet-based company, Go2Net, and that, not long after the acquisition, Merrill Lynch reduced its rating for InfoSpace. Finally, the affidavit alleges that, between July 2000 and April 2001, Merrill Lynch analysts expressed their concern that, if InfoSpace's CEO were to leave the company, the stock would be a "piece of junk." On December 20, 2000, Infospace announced that a lawsuit had been filed against the company's CEO alleging multiple securities violations. The NYAG Affidavit also alleges that Blodgett privately expressed the worry he was "not comfortable" with the CEO's association with the company. (Id., Ex. B at 35.) The affidavit concludes that, in light of the positive ratings bestowed on Infospace and the private reservations expressed by the analysts, "[t]he evidence suggests that business considerations influenced the internet group in maintaining its buy rating for Infospace as long as it did." (Id.)

Nowhere in the NYAG's Affidavit is it explicitly alleged, however, that Merrill Lynch's analysts did not believe in the positive recommendations they bestowed on InfoSpace at the time they were made. Nor is there any allegation that the analysts reported any fact relating to InfoSpace that was actually untrue. Like the Intervention Complaint, the NYAG Affidavit thus fails to allege why the ratings and recommendations relating to InfoSpace were actually false when issued.

In sum, the Intervention Complaint does not come close to pleading its allegations of Merrill Lynch's fraudulent conduct with the particularity required by Rule 9(b).  Although the Intervention Complaint liberally uses words such as "misleading" and false," to characterize Defendant's behavior, the complaint fails to identify any single false statement that relates to any single ML Stock. The complaint also fails to allege that any statements made by Merrill Lynch's analysts were actually false when made.  Absent such allegations, the Intervention Complaint cannot meet the requirements of Rule 9(b).

Tellingly, Morris does not even attempt to argue in his brief that the pleadings satisfy Rule 9(b).  Rather, he simply contends that "the requirements of Rule 9(b) do not apply to [the Intervention Complaint's] allegations, which only assert breaches of fiduciary duties."  (Pl. Rep. Mem. at 10.)  Morris claims instead that "the simple requirements of Rule 8(a)" apply and that the Intervention Complaint satisfies Rule 8's pleading burden by providing Merrill Lynch with fair notice of his state law claims.[2] (Id.)

In arguing that he need not comply with Rule 9 because his causes of action are not denominated as claims of fraud, Morris

---

[2] Rule 8 requires that the complaint simply provide "the defendant [with] fair notice of what the plaintiff's claim is and the grounds upon which it rests." Fed. R. Civ. P. 8(a)(2).

cites to several inapposite cases. In re Tower Air, Inc., 416 F.3d 229 (3d Cir. 2005), for example, involved a derivative suit in which shareholders brought claims against the directors for gross negligence, inattention and/or irrationality under Delaware law; there were no allegations in that case, however, that the directors acted fraudulently. Similarly, in Cement-Lock v. Gas Technology Institute, No. 05 C 0018, 2005 WL 2420374 (N.D. Ill. 2005), the Northern District of Illinois declined to apply the heightened pleading standards of Rule 9(b) after finding that plaintiffs' claim of the defendants' breach of fiduciary duty was "based on their alleged self-dealing, non-arm's-length deals, and misappropriation of [plaintiffs'] monetary and intellectual property, even in the absence of fraud." Id. at *17 (emphasis added). Unlike In re Tower Air and Cement-Lock, the present claims, as discussed, are wholly reliant on allegations of the defendant's fraudulent conduct. The crux of Morris' complaint is that Merrill Lynch, motivated by an undisclosed conflict of interest and in violation of its advertised objectivity, manipulated the market to inflate artificially the prices of the ML Stocks. Because Morris' claims stem entirely from the alleged fraudulent conduct of the Defendant, it is Rule 9(b), not Rule 8, that Morris must satisfy. See, e.g., Rombach, 355 F.3d at 171. The Intervention Complaint falls far short of complying with the

rule.  Accordingly, Morris' motion to intervene must be denied as futile.[1]

## CONCLUSION

Because the Intervention Complaint fails to satisfy the pleading requirements of Rule 9(b), Morris' motion to intervene is DENIED as futile.  In the event that Defendant wishes to file a motion to dismiss this action, it is directed to do so no later than fifteen (15) days following the entry of this Order.


SO ORDERED.

Dated: New York, New York
    June 26, 2008

                                    John F. Keenan
                                _____
                                    JOHN F. KEENAN
                                United States District Judge


---

[1] Because the Intervention Complaint is rejected for its failure to comply with the pleading requirements of Rule 9(b), I need not decide whether the complaint adequately pleads the state law claims, nor whether Morris' claims relating to future losses are overly speculative.